

ATTORNEYS AT LAW

John J. Kennedy, J.
Robert L. Schwab
Stephanie Z. Roberg
Patrick J. Kennedy
Louis A. Annecchin
Brendan K. Nelliga
Michael R. Kenned
Isabelle L. Koch

Clifford J. Grandjea
of Counsel

*Also admitted in N.

David H. Johnson
(1988 – 2013)

The Honorable S. Dave Vatti
United States Magistrate Judge, District of Connecticut
Brian McMahon Federal Building
915 Lafayette Boulevard
Bridgeport, Connecticut 06604                   **JANUARY 16, 2026**

RE:     <u>Nancy Labroad v. Costco Wholesale Corp. et al</u>, 3:24-cv-01102-KAD

The plaintiff in the above matter respectfully submits this letter brief in response to the defendant's correspondence to the Court dated January 5, 2026 and the ensuing telephonic conference held before the Honorable S. Dave Vatti on January 8, 2026.

Under the well established principles governing depositions noticed pursuant to F.R.C.P. 30(b)(6), the defendant is obligated to prepare and produce a designee to testify regarding the areas of inquiry ordered by the Court on October 23, 2025. If it is the corporation's position that they do not have policies or procedures regarding pedestrian safety in Costco parking lots, this fact is plainly known to the corporation as evidenced by their submissions to the Court. Consequently, it is their obligation under Rule 30 to present a witness to so testify and allow the plaintiff to prepare her case for trial. In support of the following, the plaintiff respectfully submits the following.

**Procedural Background**

This case concerns injuries sustained by the plaintiff in the parking lot abutting a Costco Warehouse in Enfield, Connecticut whereby she was struck by the apportionment defendant while crossing from the Costco warehouse exit to the parking lot. Discovery has revealed that Costco has long operated a retail warehouse at this location in Enfield. Recent depositions have demonstrated that in the months prior to the plaintiff's injury, a new crosswalk was added to the parking lot in the immediate vicinity to where the plaintiff was struck by the apportionment defendant as part of ADA modifications to the parking lot.

On October 23, 2025, following argument on the Defendant's Motion for Protective Order, Docket No. 30, the Court ordered that the defendant produce a corporate designee on two topics which may be generally described as 1) training and guidelines provided to Costco managers concerning traffic safety and 2) corporate policies and procedures regarding pedestrian safety and risk mitigation at Costco Wholesale warehouses. Docket No. 41. The Court further ordered the corporate designee to produce certain documents and information as outlined in the order. <u>Id.</u> Additionally, the Court granted the plaintiff's oral motion to conduct a Rule 40 deposition of Costco employee Bill Stanfield, a project manager involved in the construction project that resulted in the addition of a new pedestrian crosswalk in 2022. <u>Id.</u> The Court's order

50 Washington Street
Suite 1015, 10th Floor
Norwalk, CT 06854
TEL: (203) 354-4559

MAILING ADDRESS:
Long Wharf Maritime Center
545 Long Wharf Drive, Suite 304
New Haven, CT 06511
TEL: (203) 865-8430
FAX: (203) 865-5345

15 N. Main Street #100
Suite 217
West Hartford, CT 06107
TEL: (203) 354-4559



John J. Kennedy, J.
Robert L. Schwab
Stephanie Z. Roberg
Patrick J. Kennedy
Louis A. Annecchin
Brendan K. Nelliga
Michael R. Kenned
Isabelle L. Koch

Clifford J. Grandjea
of Counsel

*Also admitted in N.

David H. Johnson
(1988 – 2013)

indicated that it was without prejudice to the plaintiff should additional areas of inquiry be identified following the deposition of Bill Stanfield and the corporate designee.

In response, the defendant produced various documents, including development standards it authors concerning development and construction at its locations. Since the discovery conference held in October, the plaintiff secured the deposition of Bill Stanfield. Mr. Stanfield testified that he had no involvement with the 2022 project until after it was underway. When asked regarding the process Costco uses when undertaking construction at its locations, he testified that by the time project is assigned to him "there's a predesign that's already been done. The predesign's already done with our operations end of the company that has already approved that concept to agree to do it to a building, whatever that happens to be." Exhibit A, Dep. of Stanfield 27-28. He further testified that "…operations works with the architect to determine what exactly they're going to approve or not approve to be built." Id. at 28. Mr. Stanfield's testimony establishes that Costco operations, which he described as "retail management of the buildings" plays an affirmative role in the design and implementation of construction projects at its stores and that projects are defined by "what operations wants to see." Id.at 30, 32.

The documents produced in response to the Court's order further demonstrate that Costco has direct involvement in projects in its parking lot. In response to the Court's order of October 23, 2025, Costco produced documents including a Project Manual and a redacted Development Guidelines. In part, these documents direct that personnel are to "[a]void layout schemes that direct vehicular traffic in front of the main entrance to the Warehouse." Exhibit B. In reviewing these documents, it is plain that the defendant does promulgate at least some manner of instructions and materials that bear on the construction and maintenance of parking lots.

By way of letter dated January 5, 2026, the defendant requested a status conference to discuss issues pertaining to the 30(b)(6) deposition ordered by the Court. The defendant's letter indicates that witness cannot be designated because the defendant "did not provide training and instructions to managers" concerning traffic safety and that they do not have any … "policies, provisions, instructions" regarding pedestrian safety and risk management in Costco parking areas. Importantly, based upon the letter, the defendant's do not assert that they do not possess the information sought; rather, it appears that their position they have determined that they do not have or maintain the type of training, policies, and procedures as outlined in the Court's order.

### The Defendant's Obligations Under FRCP 30(b)(6)

The law governing corporate designee depositions is well established. A Rule 30(b)(6) witness represents the collective knowledge of the corporation who presents the corporation's position on specific topics. QBE Ins. Corp v. Jorda Enterprises. Inc., 277 F.R.D. 676 (688 (2012). Rule 30(b)(6) imposes an affirmative duty to provide a witness who will give binding testimony on behalf of the corporation. See, Reilly v. Natwest

50 Washington Street
Suite 1015, 10th Floor
Norwalk, CT 06854
TEL: (203) 354-4559

MAILING ADDRESS:
Long Wharf Maritime Center
545 Long Wharf Drive, Suite 304
New Haven, CT 06511
TEL: (203) 865-8430
FAX: (203) 865-5345

15 N. Main Street #100
Suite 217
West Hartford, CT 06107
TEL: (203) 354-4559



John J. Kennedy, J.
Robert L. Schwab
Stephanie Z. Roberg
Patrick J. Kennedy
Louis A. Annecchin
Brendan K. Nelliga
Michael R. Kenned
Isabelle L. Koch

Clifford J. Grandjea
of Counsel

*Also admitted in N.

David H. Johnson
(1988 – 2013)

Markets Grp. Inc., 181 F.3d 253, 268 (2d Cir. 1999). Even if a single witness lacks personal knowledge of the topics in the notice, the corporation is nonetheless "…obligated to prepare them so that they may give knowledgeable answers." Patane v. Nestle Waters N. Am., Inc., 2022 WL 603027, at *7 (D. Conn. Feb. 28, 2022). The deponent himself has the same "affirmative obligation," namely, to educate himself regarding the corporate matters about which he is to testify. Concerned Citizens of Belle Haven v. Belle Haven Club, 223 F.R.D. 39, 43 (D. Conn. 2004).

Furthermore, a defendant may not avoid the obligations of a Rule 30(b)(6) deposition by asserting that written answers to discovery or production of documents are sufficient. See, Great American Ins. Co. of New York v. Vegas Const. Co., Inc., 251 F.R.D. 534, 539 (2008); In re Vitamins Antitrust Litig., 216 F.R.D. 168, 172 (D.D.C. 2003)(rejecting defendant's "mistaken view that mere authentication of the documents submitted with a corresponding disavowal of the truth or accuracy of the documents is sufficient to satisfy the requirements of Rule 30(b)(6)"). District courts have routinely held that "because of its nature, the depositions process provides a means to obtain more complete information and is, therefore, favored." Id., citing, Marker v. Union Fidelity Life Insurance, 125 F.R.D. 121, 126 (M.D.N.C. 1989).

Under Rule 30(b)(6), the defendant's obligation extends not only to its immediate employees, but to all reasonably available information, "whether from documents, past employees, or other sources." Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC, 2013 WL 1286078, at *2 (S.D.N.Y. Mar. 28, 2013). This obligation extends to information under the corporation's direct control, as well as information obtainable by the corporation. See, Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc. 2002 WL 1835439 at *2 (S.D.N.Y. 2002). Indeed, while the obligations of preparing and producing a Rule 30(b)(6) witness may be onerous, "this consequence is merely an obligation that flows from the privilege of using the corporate form to do business." Great American, 251 F.R.D. t 540.

Lack of knowledge, which the plaintiff would submit is not implicated in the present case, is likewise not sufficient grounds to preclude a Rule 30(b)(6) deposition. Courts have held that "…the 'we-don't-know' response can be binding on the corporation…" and "…the lack of knowledge answer is itself an answer which will bind the corporation at trial." QBE Ins. Corp., 277 F.R.D. at 690; Ierardi v. Lorillard, Inc. 1991 WL 66799, at *2 (E.D. Pa. Apr. 15, 1991).

**Argument**

As an initial matter, the Court requested that the plaintiff address the question of a corporation's obligation under FRCP 30(b)(6) where a defendant claims that no such witness exists. In this regard district court's have held that "…the lack of knowledge answer is itself an answer which will bind the corporation at trial" and that the corporation is obligated to produce such a witness. QBE Ins. Corp. v. Jorda Enterprises, Inc., 277 F.R.D. 676 (2012). As such, if it is the defendant's position that they do not

50 Washington Street
Suite 1015, 10th Floor
Norwalk, CT 06854
TEL: (203) 354-4559

MAILING ADDRESS:
Long Wharf Maritime Center
545 Long Wharf Drive, Suite 304
New Haven, CT 06511
TEL: (203) 865-8430
FAX: (203) 865-5345

15 N. Main Street #100
Suite 217
West Hartford, CT 06107
TEL: (203) 354-4559



**KENNEDY JOHNSON**
KJSR **SCHWAB & ROBERGE, P.C.**

ATTORNEYS AT LAW

*John J. Kennedy, J.*
*Robert L. Schwab*
*Stephanie Z. Roberg*
*Patrick J. Kennedy*
*Louis A. Annecchin*
*Brendan K. Nelliga*
*Michael R. Kenned*
*Isabelle L. Koch*

*Clifford J. Grandjea*
*of Counsel*

*\*Also admitted in N.*

*David H. Johnson*
*(1988 – 2013)*

provide training or maintain any policies or procedures concerning the items enumerated in the notice, that in no way relieves them of the obligation to prepare and produce a witness to testify as a corporate designee. Even if they were willing to profess such ignorance or lack of information by way of affidavit or otherwise, the witnesses "should have to establish [their] ignorance at deposition" as the "wide scope of discovery afforded by the federal rules demands no less." Amherst Leasing Corp. v. Emhart Corp., 65 F.R.D. 121, 123 (D. Conn. 1974).

Vitally, the defendant does not claim that it cannot locate or is ignorant of the topics ordered by the Court. Quite the opposite; the defendant's letter brief indicates that they have conducted a search as required by the rules and that said search reveals that no such training, policies, or procedures exist. Certainly, this information necessarily originated from an individual or individuals at Costco who have knowledge of these topics. Furthermore, the defendant has produced documents as part of the Rule 30(b)(6) notice. By its very production, it is evident that someone at the corporation is knowledgeable on these subjects. The plaintiff is absolutely entitled to cross-examine the corporation regarding the contents of these documents, their application, and the existence of other discoverable information. The defendant may not produce documents responsive to requests in a corporate designee and simultaneously refuse to designate a corporate representative to testify regarding the same.

Indeed, discovery taken to date demonstrates that the defendant does possess information relevant and responsive to the corporate designee topics. As it pertains to training, it is known that Costco managers are provided continuing training and are subject to oversight by corporate level employees. Exhibit C, Dep. of Cunningham, 19-20. Discovery has further established that Costco promulgates written requirements for projects on their job sites. Exhibit A, Dep. of Stanfield 50-51. As aforesaid, Mr. Stanfield has testified that Costco operations is directly involved in the planning and predesign of construction projects at its locations.

The plaintiff would note that the defendant's present position is at odds with their arguments advanced by way of Motion for Protective Order. There, the defendant argued, inter alia, that the information sought by the plaintiff was so overbroad and so burdensome that compliance was impossible. Now, having narrowed and refined the topics with the Court's assistance, the defendant argues that they cannot produce such a witness. It strains credulity that the defendant cannot designate an individual to testify regarding the training that managers in District 2 received in 2017-2022. If they receive no training regarding pedestrian safety or issues pertaining to traffic, the defendant is still obligated to produce a witness whose testimony can bind the defendant to that assertion so the plaintiff may prepare for trial.

With regards to the defendant's argument concerning its use of architects, it is clear that Costco has a direct role in the planning and implementation of projects at its store before it reaches the construction division. The plaintiff is entitled to depose a representative who can testify regarding the corporation's position and knowledge, if

50 Washington Street
Suite 1015, 10th Floor
Norwalk, CT 06854
TEL: (203) 354-4559

MAILING ADDRESS:
Long Wharf Maritime Center
545 Long Wharf Drive, Suite 304
New Haven, CT 06511
TEL: (203) 865-8430
FAX: (203) 865-5345

15 N. Main Street #100
Suite 217
West Hartford, CT 06107
TEL: (203) 354-4559



John J. Kennedy, J.
Robert L. Schwab
Stephanie Z. Roberg
Patrick J. Kennedy
Louis A. Annecchin
Brendan K. Nelliga
Michael R. Kenned
Isabelle L. Koch

Clifford J. Grandjea
of Counsel

*Also admitted in N.

David H. Johnson
(1988 – 2013)

any, regarding pedestrian safety and risk mitigation in projects and ongoing operation of the defendant's locations. Indeed, the designee's obligation may well include gathering information regarding these topics from the architect and other parties, as it is clear that Rule 30(b)(6) requires the defendant to prepare a designee based not only on the personal knowledge of its current employees, but also former employees and "other sources." Bank of New York v. Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997).

Under Rule 30(b)(6), to the extent that the defendant claims that the topics enumerated implicate the architect or other contractors on this specific project, the defendant's designee is obligated to investigate, prepare, and educate himself regarding the same, which may well include obtaining information from the architect or other contracted parties. See, Twentieth Century, 2002 WL 1835439 at *2.  Asserting that the defendant's obligation is satisfied by pointing to a third party is not sufficient under the Federal Rules as the corporation has an affirmative duty to seek out information "reasonably available" to the defendant, which may well require the designee to interview or speak with the architect or other contractors in order to adequately prepare for the deposition. See, Bigsby v. Barclays Capital Real Estate Inc., 329 F.R.D. 78, 82 (S.D.N.Y. 2019). If it is the defendant's position that the architect plays a role in their maintenance of the premises, the plaintiff is entitled to establish the corporation's position by way of a corporate designee.

**Conclusion**

The defendant should be directed to prepare and produce an individual or individuals prepared to testify regarding the topics and documents previously ordered by the Court. The plaintiff would additionally request that a designee be designated to testify regarding the operation and "predesign" efforts undertaken by the defendant as part of this specific project in 2022 in light of Mr. Stanfield's testimony at deposition.

Finally, the plaintiff would respectfully ask that the Court permit the plaintiff adequate time after the completion of these depositions to disclose liability experts, as the substance of these depositions may bear on any such witnesses testimony. The current deadline is set for February 1, 2026.

Respectfully submitted,

Brendan K. Nelligan, counsel for the Plaintiff

50 Washington Street
Suite 1015, 10th Floor
Norwalk, CT 06854
TEL: (203) 354-4559

MAILING ADDRESS:
Long Wharf Maritime Center
545 Long Wharf Drive, Suite 304
New Haven, CT 06511
TEL: (203) 865-8430
FAX: (203) 865-5345

15 N. Main Street #100
Suite 217
West Hartford, CT 06107
TEL: (203) 354-4559

# Exhibit A

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF CONNECTICUT
 3
                CIVIL ACTION # 3:24-cv-01102
 4
 5
        ---------------------------x
 6                                  :
        NANCY LABROAD,              :
 7                                  :
                Plaintiff,          :
 8                                  :
           -versus-                 :
 9                                  :
        COSTCO WHOLESALE CORP.,     :
10      COSTCO WHOLESALE            :
        MEMBERSHIP, INC.,           :
11                                  :
                Defendants.         :
12                                  :
        ---------------------------x
13
14
15           Deposition of BILL STANFIELD, taken
16      pursuant to the Federal Rules of Civil
17      Procedure, held remotely viz Zoom platform,
18      before Deborah L. Marotta, LSR #210, a Notary
19      Public in and for the State of Connecticut, on
20      Monday, December 8, 2025, at 1:30 PM.
21
22
23
24
25
```

Page 2

```
 1   A P P E A R A N C E S:
 2   FOR THE PLAINTIFF:
 3      Kennedy, Johnson, Schwab & Roberge, LLC
        555 Long Wharf Drive, 13th Floor
 4      New Haven, Connecticut    06511
        Phone:  203.865.8430
 5
     BY:  BRENDAN NELLIGAN, ESQ.
 6
 7   FOR THE DEFENDANT:
 8      Esty & Buckmir, LLC
        2285 Whitney Avenue
 9      Hamden, Connecticut    06518
        Phone:  203.248.5678
10
     BY:  MILES ESTY, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 S T I P U L A T I O N S
 2
 3           IT IS HEREBY STIPULATED AND AGREED by
 4   and between counsel for the respective parties
 5   hereto that all technicalities as to proof of
 6   official character before whom the deposition is
 7   to be taken are waived.
 8
 9           IT IS FURTHER STIPULATED AND AGREED by
10   and between counsel for the respective parties
11   hereto that the reading and signing of the
12   deposition by the deponent are waived.
13
14           IT IS FURTHER STIPULATED AND AGREED by
15   and between counsel for the respective parties
16   hereto that all objections, except as to form,
17   are reserved to the time of trial.
18
19           IT IS FURTHER STIPULATED AND AGREED by
20   and between counsel for the respective parties
21   hereto that said deposition is being conducted
22   remotely.
23
24                     * * * * * *
25
```

Page 4

```
 1   B I L L   S T A N F I E L D,   of 999 Lake
 2   Drive, Issaquah, Washington    98027,
 3        called as a witness, having been first
 4        duly sworn by Deborah L. Marotta, LSR
 5        #210, a Notary Public in and for
 6        the State of Connecticut, was examined
 7        and testified as follows:
 8   DIRECT EXAMINATION
 9   BY MR. NELLIGAN:
10      Q.   Good afternoon.  It's afternoon here,
11   but good morning to you, Mr. Stanfield.  My
12   name's Brendan Nelligan, and I'm here to take
13   your deposition today in connection with a
14   lawsuit that's been filed against Costco.
15           First of all, are you able to hear
16   me okay today?
17      A.   Yeah.  At some point here, I'm going to
18   try to adjust the volume without ruining this
19   thing.  You're coming in quite nicely to the
20   point of booming.  But, anyway, it's okay; keep
21   moving.
22      Q.   All right.
23           MR. ESTY:  Brendan, before we
24   start, why don't we just say are the usual
25   stipulations okay?
```

Page 25

1  jobs?
2      A.  Well, we have different jobs that come
3  up at various times.  They're all sort of
4  triggered by how they're budgeted here and
5  approved.  When they're completed through permit
6  process from our architect and you basically end
7  up with a contractor and a contract, they pull a
8  permit at some point.  They go out there and
9  coordinate a pre-con, and then they start and do
10 the work.
11          On a very infrequent basis,
12 project managers here, because of the volume of
13 the jobs, they go out and visit and observe
14 what's going and the performance of the project
15 by the contractor, who is dealing with the work
16 onsite and working with the warehouse on a daily
17 basis to get it built or whatever it happens to
18 be that they're building.
19          We don't have a periodic routine
20 way of doing it to say every three weeks, go
21 here or there.  If you're doing a ground-up, it
22 might be more routine because they have a very
23 very set schedule, a time frame from day one to
24 day finish.
25          Whereas these jobs that I do, they

Page 26

1  have a tendency to slip simply because of issues
2  you find as you are building.  City permitting
3  issues even in the field after they're
4  permitted, weather, contractor can't get
5  material or labor all create issues that at
6  times we deal with just like we're doing now on
7  a Zoom call.  And other times I literally have
8  to get on a plane to go out there and look at
9  it.
10     Q.  Okay.  That's helpful.  So in terms of
11 the work that you perform as a project manager,
12 are you involved at all in coordinating the
13 permitting for projects?
14     A.  No.
15     Q.  And I think you indicated just in
16 response to the last question that for some of
17 these jobs, at least, Costco utilizes the
18 services of an architect?
19     A.  I'd say on 98 percent of them.
20     Q.  Okay.  And in terms of your role as a
21 project manager, are you becoming involved in
22 the project before or after an architect has
23 been retained in connection with the project?
24     A.  About the same time.  About at the same
25 time.

Page 27

1      Q.  All right.  And at the time that you
2  are assigned to a job involving an architect,
3  are you dependent on the architect sketching out
4  a drawing for you to begin your role as a
5  project manager, or your work starts
6  contemporaneous with that?
7      A.  As a general rule, we'll sit back and
8  wait for them to get these drawings put together
9  and put them into the city for permitting and
10 let them go about that process and doing all of
11 what they consider to be due diligence, anything
12 it takes to put the drawings together that they
13 think will get approved by the city.  The
14 process itself for the permitting and all of
15 that, that's their burden.
16         When it gets closer to being an
17 actual project that can be built, we can get a
18 contractor to bid it and actually do the work, I
19 get more engaged.  In the beginning stages, I
20 don't.  Simply because drawings take time,
21 permitting takes time.  And it's -- both ends of
22 that are very unpredictable.
23     Q.  Understood.  And so I'm just trying to
24 get a sense as to how this gets to you.  Do your
25 superiors assign a job to you and tell you this

Page 28

1  is something that's also going to the architect?
2  Or are you brought on board after the
3  architect's already sketched something out, and
4  you're going to start the permitting process
5  with a goal towards actually implementing the
6  project?
7      A.  Well, there's a predesign that's
8  already been done.  The predesign's already done
9  with our operations end of the company that has
10 already approved that concept to agree to do
11 it to a building, whatever it happens to be.
12         I get involved after there's
13 already an architect, after there's already a
14 budget, after there's already something being
15 drawn up for a permit.
16     Q.  All right.  And you referenced just a
17 moment ago predesign operations; is that a
18 separate part of the company that deals with --
19     A.  No.
20     Q.  -- projects?
21     A.  No.  It's just that operations works
22 with the architect to determine what exactly
23 they're going to approve or not approve to be
24 built.  And a lot of times -- well, it depends
25 on what's being built.  I mean, if you want it

Page 29

1  in simple -- simple terms, and I think it's easy
2  to illustrate.
3         They say they want an addition
4  onto the side of the building. The architect
5  will put some schematics together and very light
6  detail on it and show it to the operations top
7  management of something -- let's say they want
8  10,000 square feet.
9         Well, it could be a 10,000 square
10 foot rectangle or a 10,000 square foot box. And
11 depending on what operations wants to see and
12 how they think it's going to work with the size
13 of the building and where you would locate it on
14 the walls, that's how they would come up with a
15 concept of what it should look like. And then
16 they would sign it off and approve it amongst
17 themselves.
18         Once they get that approved, then
19 they get an idea of what the cost would be. And
20 then operations, again, makes the final say.
21 Are we going to spend money on design work and
22 go into the city to get this approved if we
23 don't even like the numbers that we think we're
24 going to get that it's going to cost us to build
25 it? They do all of this behind the curtain that

Page 30

1  I don't have anything to do with.
2         It would be the same thing if they
3  were buying real estate next to the building to
4  build that addition on. Our real estate
5  department would get involved to do that behind
6  the curtain. I only really get involved in
7  these things once they are legitimately almost
8  ready to go into the city to be permitted.
9     Q.  Okay.
10    A.  They're not asking -- they don't ask my
11 opinion.
12    Q.  Understood. When you say "operations,"
13 I just want to make sure I understand what you
14 mean by that. What do you mean when you say
15 operations is approving or being involved?
16    A.  Operations is essentially where I came
17 from originally, which is retail management of
18 the buildings. I used to be the assistant
19 manager and an MIT and a GM of the management
20 system that managed the building.
21    Q.  Okay.
22    A.  Their bosses -- their bosses are the
23 ones that are involved in determining whether or
24 not they want to add a new food court, they want
25 to add a canopy, they want to add an addition,

Page 31

1  they want to add more to the fresh line inside
2  the building, they want to add more to the
3  optical.
4         All of those kind of decisions
5  that actually have some effect on the staff, the
6  members, the building, they have to approve it.
7  They have to approve the general concept of cost
8  before anybody in our area has anything to do
9  with it.
10    Q.  Understood. And so when you use the
11 term "operations" you're talking about the
12 people on the retail side -- you know, general
13 manager warehouses and above -- who determine
14 that there's a need for some project, and they
15 get the ball rolling on that; is that fair?
16    A.  Well, they get it rolling to the point
17 where they get these drawings with an estimated
18 cost in front of a senior vice president or an
19 executive vice president or Ron Vachris,
20 depending on if it's over a million dollars.
21 They all have to sign off on this stuff, and
22 they are all operational people.
23    Q.  Understood.
24    A.  They basically -- they walk the
25 buildings on a regular basis just to see how the

Page 32

1  operations is running boots on the ground. If
2  they don't like it, my advice, my suggestion, my
3  consideration has nothing to do with it.
4     Q.  Understood. And I thought I heard you
5  use a name, Ron Vachris; who's that?
6     A.  He's the CEO of the company.
7     Q.  Understood. All right. And so in
8  terms of work that you're doing for Costco
9  Construction, it sounds like most of the time
10 you'll receive this to the point where they've
11 decided to do the project, and they're going to
12 start with the actual nuts and bolts of getting
13 the project constructed; is that fair?
14    A.  I usually see it when it's in the midst
15 of getting a permit. In other words, usually at
16 the stage that I actually don't pay attention to
17 it is what they call the "permit submittal
18 stage."
19        Once the architect has this
20 drawing that's going to be permitted by the city
21 and submits it to the city, I'll take a look at
22 it then. I'm not really making changes on it.
23 I'm just looking at what it happens to be in
24 scope. Because that thing has pretty much been
25 defined by what operations wants to see.

Page 49

1   Q.  No.  I'm asking a slightly different
2   question.
3           So have you been involved in
4   projects as a project manager for Costco
5   Construction in which modifications were made to
6   an existing park lot that changed the direction,
7   the flow, or the location of vehicles moving
8   throughout that parking lot?
9   A.  Probably to a degree depending on --
10  and to some degree.  To some degree on some
11  jobs, yes.
12  Q.  Okay.  And in those situations, have
13  you ever voiced your opinion concerning how
14  those modifications will impact traffic
15  circulation and the use of that parking lot
16  going forward after the completion of the
17  modification?
18  A.  No.
19  Q.  And I take it from your previous
20  responses that that's not something within your
21  purview as a project manager; correct?
22  A.  Exactly.
23  Q.  Okay.  So I want to show you a couple
24  documents if I could, sir.
25          MR. NELLIGAN:  And just for the

Page 50

1   record I'm going to mark the Notice as Exhibit
2   A.
3           (Plaintiff's Exhibit A:  Depo
4   notice.)
5   Q.  And before I get to this, did you
6   review any documents in preparation for your
7   deposition here today, sir?
8   A.  I looked at a couple of things with my
9   attorney.
10  Q.  I don't want to know anything --
11  A.  With Miles.
12  Q.  I don't want to know anything you
13  talked to Miles about.
14  A.  Okay.
15  Q.  I do want to know, I am entitled to
16  know what documents you looked at.  So can you
17  just describe to me what types of documents you
18  looked at?
19  A.  Site plans.
20  Q.  And would that be site plans in
21  connection with ADA modification work that was
22  done in Enfield back in 2022?
23  A.  Yes.
24  Q.  All right.  So I'm going to show you
25  what we've marked here today as Exhibit B.  I'm

Page 51

1   going to pull it up on the screen.
2           (Plaintiff's Exhibit B:  Costco
3   Wholesale Development Requirements.)
4           MR. NELLIGAN:  Are you able to see
5   my screen, sir?
6   A.  Yes.
7   Q.  And I'll represent to you this is a
8   document that was provided to us by way of
9   discovery.  It's entitled Costco Wholesale
10  Development Requirements.  The document is 477
11  pages long, and we've marked it as Exhibit B.
12          Can you describe to me, sir, what
13  this document is?
14  A.  On a very limited basis.  I don't -- I
15  don't utilize this at all.  Because these are
16  primarily used for real estate department people
17  working to go select and source ground-up
18  locations.  And these are basically the criteria
19  they try to go by as best they can as to what
20  the minimums and maximum tolerances are going to
21  be for what the site should be or look like that
22  they're going to consider recommending to our
23  operations people here and to purchase the
24  property.
25  Q.  Okay.  And so it's your testimony that

Page 52

1   what we see here in Exhibit B, these Development
2   Requirements, are promulgated by Costco; and
3   it's directed towards other Costco employees in
4   developing sites?
5   A.  Well, I can't tell you exactly who puts
6   this together.
7   Q.  Okay.
8   A.  All I know, this is the criteria that
9   I've come to understand is what they -- it's a
10  starting point, reference point.  I'm sure it's
11  at times amended.  But, again, this primarily is
12  coming out of the ground-up mindset is what this
13  is for.
14  Q.  Have you utilized the Costco Wholesale
15  Development Requirements in connection with
16  projects in which a site is being modified as
17  opposed to a ground-up?
18  A.  Not really, no.
19  Q.  All right.  And at any time have you
20  ever utilized Exhibit B, Costco Wholesale
21  Development Requirements, in connection with a
22  modification of existing site?
23  A.  No.
24  Q.  Okay.  And do you know whether or not
25  the Development Requirements provide any

Page 93

1  parking lots, excluding ADA Compliance work?
2      A.   Maybe once or twice, maybe a half dozen
3  times; but, I mean, so infrequent, I couldn't
4  tell you which year.
5      Q.   Okay.  And as you sit here today, do
6  you know what additional signage was installed
7  in those situations?
8      A.   Not really.  I mean, it would probably
9  be -- I'm just speculating; I don't even
10 remember what -- it would have been something
11 like a yield sign maybe, maybe a stop sign;
12 that's about it.  I mean, we try to avoid that
13 as far as in general.
14     Q.   All right.  And why do you prefer to
15 avoid that in general?
16     A.   Because, first of all, I don't do
17 traffic studies.  I don't know the lot, don't
18 know the situation, and don't contract that
19 small of work in general.
20     Q.   Okay.  Does Costco Construction have
21 any traffic engineers or persons trained in
22 traffic studies employed within --
23     A.   No.
24     Q.   And even outside of Costco
25 Construction, are you aware of anyone else

Page 94

1  within the company who oversees traffic studies
2  or traffic -- I'm going to withdraw the
3  question.
4           Are you aware of anyone outside of
5  Costco Construction who oversees traffic studies
6  with respect to Costco parking lots?
7      A.   No.
8      Q.   That's all the questions I have for
9  you.  Thank you for working with us on the
10 technical side.  I appreciate getting this done
11 done.  And Attorney Esty may have questions for
12 you.
13          MR. ESTY:  I don't have any
14 questions for you, Mr. Stanfield.
15          And we are going to waive reading
16 and signing.
17          COURT REPORTER:  And, Attorney
18 Esty, do you need a copy?
19          MR. ESTY:  I do.  If I could have
20 a regular copy, a condensed copy with a word
21 index, please.
22
23
24          (Deposition concluded:  4:13 PM.)
25

Page 95

1              EXHIBIT INDEX
2  PLAINTIFF'S        DESCRIPTION         PAGE
3  Exh A       Depo notice                 50
4  Exh B       Costco Wholesale            51
5              Development Requirements
6  Exh C       Letter, 1/31/22             53
7  Exh D       AIA Form contract           69
8  Exh E       Project Manual              76
9  Exh F       ADA Improvement Plan        77
10 Exh G       Emails                      82
11
12
13 Note:  Attorney Nelligan retained exhibits.

Page 96

1             C E R T I F I C A T E
2
3       I hereby certify that I am a Notary Public,
4  in and for the State of Connecticut, duly
5  commissioned and qualified to administer oaths.
6       I further certify that the deponent named
7  in the foregoing deposition was by me duly sworn
8  via remote location and thereupon testified as
9  appears in the foregoing deposition; that said
10 deposition was taken by me stenographically in
11 the presence of counsel and reduced to print
12 under my direction, and the foregoing is a true
13 and accurate transcript of the testimony.
14      I further certify that I am neither of
15 counsel nor related to either of the parties to
16 said suit, nor am I interested in the outcome of
17 said cause.
18      Witness my hand and seal as Notary Public
19 this 22nd day of December 2025.
20
21            _Deborah Marotta_
22            Deborah L. Marotta, LSR #210,
               Notary Public
23
24 My commission expires:
25 May 31, 2028

# Exhibit B



# DEVELOPMENT REQUIREMENTS

Version 2020
December 18, 2020

This document contains information that is confidential and privileged. The information is intended for the sole use of the individual or entity that was directly provided this information by Costco Wholesale. Be advised that any disclosure, copying, distribution or use of the contents of this information is prohibited without the prior written consent of Costco Wholesale



LABROAD PRODUCTION 1/20/25 - 000056

COSTCO WHOLESALE DEVELOPMENT REQUIREMENTS

SECTION 08 SITE LAYOUT

# Section 08

# Site Layout

LABROAD PRODUCTION 11/20/25 - 000215

# COSTCO WHOLESALE DEVELOPMENT REQUIREMENTS
## SECTION 08 SITE LAYOUT

### A. General

For preferred Costco Wholesale site plan elements and layout see Details: 08_01 Typical Site Plan, 08_01A Typical Site Plan – with Liquor Sales, 08_02 Typical Site Plan (metric), and Detail 08_02A Typical Site Plan – with Liquor Sales (metric).

1) The site area for a new Costco Wholesale Warehouse, including the Tire Center and Fuel Facility components, is a minimum of approximately eighteen (18) acres (7.28 ha).

2) Identify the location of the new Warehouse and required site improvements (i.e. entry drives, parking, drive aisles, etc.) on a Site Plan for review and approval by Costco Wholesale.

    a) The plan shall identify applicable setbacks, buffers, easements and other site encumbrances, to verify that there are no conflicts with proposed site improvements.

    b) As the Site Plan is refined, necessary design and horizontal / vertical control elements shall be developed for construction staking and are tied into the site survey (and local coordinate system).

3) Accessible parking (ADA) shall be located such that all designated stalls are the closest parking stalls relative to the main building entrance, (measured from the front of the entrance canopy along the available path of travel). See Detail 08_13 Accessible Parking Grading Plan.

    a) See Sub-Section 7: Americans with Disabilities Act (ADA) for additional ADA information.

4) Avoid layout schemes that direct vehicular traffic in front of the main entrance to the Warehouse. Whenever possible, the entry drives shall distribute the traffic flow evenly into the parking field and avoid main access drives (for overall developments) to pass in front of the main entrance to the Warehouse.

5) Identify turning movements and circulation routes for emergency vehicles, Warehouse delivery trucks, and Fuel delivery trucks. Verify required sight distances at access drives to adjacent roadways.

    a) See Detail: 08_05 Typical Delivery Truck Templates for standard Costco Wholesale vehicles.

6) Site plan design shall consider environmental factors, such as prevailing wind direction. Where possible, in coordination with other site design factors, the main entry canopy should avoid facing directly into the prevailing wind direction.

7) In cold weather climates, a snow pile storage area shall be identified on the site plan. The snow storage area shall be coordinated between the civil Engineer and Costco Wholesale as to the minimum size and drainage requirements.

    a) The area shall be in an area that does not restrict normal vehicular circulation in the parking field; including truck delivery access to the Warehouse and Fuel Facility operations.

    b) Snow pile storage shall not be located along public walks nor within the right-of-way when the property abuts a street.

# Exhibit C

1

```
 1  UNITED STATES DISTRICT COURT
 2  FOR THE DISTRICT OF CONNECTICUT
 3
 4  CIVIL ACTION NO: 3:24-cv-01102
 5  _____x
 6  NANCY LABROAD,
 7                      Plaintiff
 8            -vs-
 9  COSTCO WHOLESALE CORP.
10  COSTCO WHOLESALE MEMBERSHIP, INC.,
11                      Defendants
12  _____x
13        Deposition of TODD CUNNINGHAM, Corporate
14  Designee of Costco Wholesale Corp., in the
15  hereinbefore-entitled action, taken by the
16  Plaintiff, pursuant to Notice before Michelle A.
17  Howell, a duly qualified Notary Public in and for
18  the State of Connecticut.  This deposition is being
19  held remotely on August 18, 2025, commencing at
20  12:43 p.m.
21
22              DEL VECCHIO REPORTING
23     STAMFORD        NEW HAVEN         HARTFORD
24                  (203) 245-9583
25
```

```
13:06:02   1        Q.   Okay.  Generally speaking do vice presidents
13:06:16   2    meet with any other of your team other than
13:06:17   3    yourself and your assistant general managers?
13:06:18   4        A.   Yes, they meet with almost every manager
13:06:23   5    that is here, you know, whether it's a bakery
13:06:24   6    manager, meat manager, food court manager, they
13:06:27   7    want to see how all facets of the business are
13:06:30   8    running and they will talk to those managers
13:06:32   9    directly when they're here.
13:06:34  10        Q.   And do you receive any ongoing training as a
13:06:59  11    general manager through Costco?
13:07:02  12        A.   Yes.
13:07:08  13        Q.   Describe what types of training you undergo
13:07:13  14    periodically through Costco.
13:07:14  15        A.   We still undergo a lot of the similar
13:07:21  16    training that we get along the way, you know,
13:07:25  17    whether it's hazmat, gas station certifications,
13:07:31  18    food safety, there's so many.  It's endless with
13:07:38  19    the various trainings that we take but we're
13:07:42  20    involved with taking it all ourselves as well.
13:07:46  21        Q.   Okay.  And is most of that done -- we had
13:07:49  22    Mr. Lisee in here earlier, is most of that done
13:07:55  23    through the Costco U platform?
13:07:58  24        A.   Yes, that's correct.
13:07:58  25        Q.   So I take it as the general manager you
```

| | | |
|---|---|---|
| 13:08:01 | 1 | undergo the same, you have similar modules -- let |
| 13:08:03 | 2 | me withdraw the question. |
| 13:08:04 | 3 | You take the same trainings on the same |
| 13:08:07 | 4 | platform that these other employees do, correct? |
| 13:08:09 | 5 | A.  Yes. |
| 13:08:10 | 6 | Q.  And throughout your tenure at Costco have |
| 13:08:14 | 7 | you undergone any training with regard to the |
| 13:08:16 | 8 | recognition of safety hazards in exterior areas of |
| 13:08:21 | 9 | Costco warehouse? |
| 13:08:23 | 10 | A.  Not that I can recall, no. |
| 13:08:27 | 11 | Q.  And it's my understanding that as part of |
| 13:08:35 | 12 | your role as general manager your direct |
| 13:08:40 | 13 | subordinates are the assistant general managers? |
| 13:08:41 | 14 | A.  That's correct. |
| 13:08:42 | 15 | Q.  And again Mr. Lisee was in here earlier and |
| 13:08:47 | 16 | he had testified that as an assistant general |
| 13:08:51 | 17 | manager they will do periodic walks once per period |
| 13:08:57 | 18 | where they'll walk both the inside and the outside |
| 13:09:00 | 19 | of the warehouse.  Is that your expectation of your |
| 13:09:03 | 20 | assistant general managers? |
| 13:09:05 | 21 | A.  Yes. |
| 13:09:05 | 22 | Q.  And you as general manager, do you undertake |
| 13:09:10 | 23 | periodic inspections of both the interior and the |
| 13:09:13 | 24 | exterior of the premises? |
| 13:09:15 | 25 | A.  As often as I can, yes. |